| | | |
|---|---|---|
| NADIM HAQUE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:08-cv-00305-DBH |
| | ) | |
| MARTIN MAGNUSSON, et al., | ) | |
| | ) | |
| Defendants | ) | |

## RECOMMENDED DECISION ON MOTIONS FOR SUMMARY JUDGMENT
### (Doc. Nos. 93 & 97)

This suit has a complicated history as initially there were many more plaintiffs from the Maine

State Prison complaining about certain prison policies that they asserted violated their

constitutional rights.   These defendants identified themselves as "Long Timers Group Inc." and

there was a period in this litigation during which the plaintiffs were represented by counsel. After

a series of motions, counsel was given leave to withdraw and certification of a class action

became impossible.  (See Doc. No. 46, Order on Pending Motions, Hornby, J.)  To make a long

story as short as possible, currently before the court is one of two pro se spin-offs of this

litigation. I now address the claims still forwarded by Nadim Haque in the context of two

summary judgment motions filed by the defendants.

Haque's amended complaint challenges a June 21, 2004, version of the Department of

Corrections' mail policy but also implicates the December, 1, 2009, revised mail policy.  In

responding to these dispositive motions, Haque maintains that his is both a facial challenge and

an 'as applied' challenge to the mail policy, so the resolution requires both strictly legal

determinations regarding the constitutionality of the policy and a factual dispute about how that

policy was applied to Haque.  In addition to his First Amendment speech and religion premised

claims, Haque also asserts that he has been deprived of procedural due process in contravention of the Fourteenth Amendment. In addition he forwards claims under the Religious Land Use and Institutionalized Persons Act (RLUIPA) and the Maine Administrative Procedure Act.

I now recommend that the Court grant the two motions for summary judgment. If this recommendation is accepted the pending motion to dismiss (Doc. No. 90) and the defendants' motion to amend the answer (Doc. No. 133) will be moot.

## DISCUSSION

### The Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a properly documented motion has engaged the gears of Rule 56, the party to whom the motion is directed can shut down the machinery only by showing that a trialworthy issue exists." McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995) (citing National Amusement Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995)). "As to issues on which the summary judgment target bears the ultimate burden of proof," Haque "cannot rely on an absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute." Id. (citing Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)). "Not every factual dispute is sufficient to thwart summary judgment; the contested fact must be 'material' and the dispute over it must be 'genuine.' In this regard, 'material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant." Id. (citing United States v. One Parcel of Real Property, 960 F.2d 200, 204 (1st Cir. 1992)). "By like

token, 'genuine' means that 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.....'" Id. (quoting One Parcel, 960 F2d at 204) "When all is said and done," I must "'view the entire record in the light most hospitable'" to Haque "indulging all reasonable inferences in [his] favor.'" Id. (quoting Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990)). And a very key part of this review relating to Haque's summary judgment pleadings is that, "summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

## Facts[1]

### A.     Statement of Fact regarding Policy Claims (Doc. No. 94) and Additional Statement of Fact relevant to Specific Mail Claims (Doc. No.98)[2]

According to the defendants, the current mail policy went into effect on December 1, 2009. (SMF ¶ 1; SAMF ¶ 1; Riley Aff. ¶¶ 5-6, 2009 Mail Policy, Doc. No. 96-1.) Haque rejoins that the December 1, 2009, mail policy was not in the law library section of the Maine State Prison (MSP). (Resp. SMF ¶ 1)[3] but I know from my personal involvement in this case that

---

[1]     In their reply brief the defendants make multiple sound arguments concerning Haque's paragraph by paragraph responsive statements. While the following version of the factual record is perhaps overly liberal in Haque's favor, I did take their arguments into account in arriving at my recommended disposition. Also, rather than belaboring the factual record with references to his legal arguments I have simply acknowledged the approach in footnotes where appropriate.

[2]     In the hopes of making the facts a little less disjointed I have interlaced the facts set forth in the two different defendants' statements. "SMF" and "Resp. SMF" refer to the policy specific statement of facts and "2d SMF" and "Resp. 2d SMF" refer to the specific mail claims statement of facts. This approach does not work with respect to Haque's additional statement of facts so I have separated out Haque's two additional statements of facts.

[3]     On this score Haque references Paragraph 9 of his Second Declaration in which he states that he did a diligent search of the prison law library and did not find a copy of the December 2009 Mail Policy therein. (2d Resp. SMF ¶ 1 (Doc. No. 117); 2d Decl. ¶ 9.) He also maintains, without any further explanation, that there is a dispute as to whether all the challenged provisions of the mail policy contain language materially identical to the prior version. (2d Resp. SMF ¶ 1.) These qualifications are frivolous.

Haque had the policy in hand by December 11, 2010. (<u>See</u> Report of Conference of Counsel and Order at 2, Doc. No. 54.) [4]

Procedure A.7 of the mail policy provides, in pertinent part: "A prisoner may be prohibited from sending general mail to or receiving general mail from any other person by the Chief Administrative Officer, or designee, when there is reasonable suspicion that mail between them would contain contraband…." (SMF ¶ 2; 2009 Mail Policy at 3, Page Id. No. 801.) [5] This procedure became effective as to prisoners who receive mail with a foreign substance on it after the prisoners were given a two-week grace period to notify their correspondents of the ban on foreign substances. (SMF ¶ 3; Am. Compl. Ex. T.) [6] The items that prisoners are allowed to have sent to them by mail and that they are not allowed to have sent to them by mail are clearly specified both in the mail policy and the property policy. (SMF ¶ 4; 2009 Mail Policy, particularly Procedures A.11, 12, 15 to 23, C.6, E.1 to 3, and F.7, Doc. No. 96-1; Riley Aff. ¶¶ 9-10 and 2010 Property Policy, particularly Procedures A.1 and 2, D.1 and 5 and Attachment A

---

[4]     As support for this denial Haque cites his second opposing statement of fact which is Document 117. I am not able to discern from that lengthy paragraph how Haque believes that it supports this assertion of unavailability. In response to Paragraph 1, Haque further asserts that there are "disputed factual issues as to whether the changes in policy make this lawsuit moot." (Resp.SMF ¶1.) I have concluded that it is possible to resolve these dispositive motions without delving into the mootness inquiry.

[5]     Haque's denial of this paragraph makes absolutely no sense. He maintains that there is a factual dispute as to what version of Procedure A.7 is in dispute here and then he relies on an earlier version of the policy that is identical as to this subsection, although Haque omits one word in his block quote. (Resp. SMF ¶ 2; Doc. 1, Ex. at 3, Page ID No. 17.)

[6]     Haque denies this paragraph by asserting that there is a dispute as to whether the provisions of the interdepartmental memorandum (Exhibit T) are different from Procedure A.7 and as to whether the former is constitutional. (Resp. SMF ¶ 3.) Along with citing Paragraphs 130, 131, 175, and 177, of his amended complaint, Haque cites to the Declaration of Christian A. Averill. In this declaration Averill states that his phone and mail privileges were suspended for one year in December 2010, he had no due process rights/he did not have a disciplinary hearing. (Doc. No. 121-1, Page ID No. 1112.) Attached to this declaration is a letter from the Warden describing a past prohibition on Averill's contact with a specific person, the Warden's information that he continued to communicate with this individual and that he attempted to cover-up this communication, and informing him of his suspension of all telephone privileges and all mail privileges except correspondence with privileged correspondents. (Doc. No. 121-2, Page ID No. 113.) This exhibit would not be admissible, as is, at trial and even if it were it hardly creates a <u>genuine</u> dispute material vis-à-vis this statement of fact.

4

(Prisoner Allowable Property List), Doc. No. 96-3).[7]   Haque counters that there are material disputes of fact related to how "clear" the mail policy is regarding what items prisoners are allowed to have sent to them and whether or not they are applied as written.  (Id.)   For this proposition Haque cites to numerous paragraphs of his amended complaint, several of which assert that terms used are insufficiently defined (see Am. Compl. ¶¶ 102, 104, 105, 106, 109), some of which argue that there is too much delegated authority allowing personnel to decide to withhold, delay, confiscate and/or allow prisoner mail, and that there are other summaries and memos and such that dictate whether a prisoner gets his or her mail (id. ¶¶ 130, 131, 134, 153).  I address these vagueness/unbounded discretion assertions in a separate discussion below.

Procedure A.12.a of the mail policy explains by examples what are deemed items with "no substantial monetary value" (e.g., greeting cards with recorded music, messages, or sound effects, writing materials, stickers, ribbons, food items, plastic items, metal items, paper clips, etc.).  (SMF ¶ 5; 2009 Mail Policy, Doc. No. 96-1 at 4, Page ID No. 802.)  Haque takes umbrage with the use of the terms "of not substantial monetary value" and  "etc." and reiterates his argument that the language of this provision is too vague.  (Resp. SMF ¶ 5.)[8]

---

[7]      In response Haque makes it clear that he is not challenging the provisions of the 2010 Property Policy cited by the defendants. (Resp. SMF ¶ 4.)

[8]      According to the defendants, the reasons the mail policy prohibits greeting cards with recorded messages is that the recording mechanism contained in these cards might be used by prisoners to jam door locks and other security devices and because without playing each message, something that would be time prohibitive, it is impossible to know if the message has threatening or other prohibited content. (SMF ¶ 6; Costigan Aff. ¶ 4.)   Also, those wishing to send messages to prisoners by way of greeting cards need only write their messages in conventional greeting cards, which are allowed.  (SMF ¶ 7; Costigan Aff.  ¶ 4.)  Without record citation, Haque responds that there is no evidence that prisoners under the authority of the MDOC have ever used recorded greeting card mechanisms to block cell door locks and asserts that the doors are controlled through a computer system and not – the majority of times – mechanically.  (Resp. SMF ¶ 6.)  As for the prospect of receiving conventional greeting cards, Haque reiterates his complaint regarding the discretion staff has to prevent the receipt of any mail item and cites to Exhibits AH and E of his amended complaint. (Resp. SMF ¶ 7.)

Beyond setting forth these responsive facts, Haque has not attempted to articulate a constitutional claim concerning recorded greeting cards specifically.  As discussed below, the defendants argue that this claim is waived and I have decided to hold Haque to the amended complaint claims articulated in his responsive memorandum.

The defendants maintain that the only limitations in the current mail policy specific to internet, computer-generated, and photocopied materials are not subject-matter based. (SMF ¶ 8; 2009 Mail Policy, Procedures A.17 – A.20, Doc. No. 96-1 at 7.) In addition to asserting, yet again, that there is a "disputed factual issue" here in reliance on his memorandum and not record citations, Haque insists that the "restrictions concerning internet, computer generated or photocopied materials ranges from the bizarre to insane." (Resp. SMF ¶ 8; Haque 1st Decl. ¶¶ 62, 63, Doc. No. 121.) In Paragraph 63 of his First Declaration, Haque cites to exhibits that are obviously in his possession at the prison that he asserts are going to be disposed of under the 2009 Mail Policy. They include the following: A copy of Article One of the United States Constitution; a graphic of faces with descriptive textual tags in the line of "how are you doing today"; a *Bangor Daily News* article regarding a suit by native Americans against the state prison over religious rights; a report in the *Bangor Daily News* about a state prison inmate suing over retaliation for protected speech; and a *Prison Legal News* article about a Colorado suit pertaining to inmate rights and mail censorship. (See Doc. Nos. 121-21 – 121-25.) I address Haque's reasoning regarding the future peril of prisoner's rights as a consequence of the application of the policy below.

The MDOC has a grievance policy that informs prisoners of their rights to appeal through three administrative levels and that provides them those rights and, therefore, a means to exhaust their remedies with respect to claims to do with mail issues. (SMF ¶ 9; SAMF ¶ 2; Riley Aff. ¶¶ 3-4; Grievance Policy, Doc. No. 96-2.)[9] The only third-level grievance appeal filed by Haque

_____

However, even if such a claim was considered worthy of discussion on the merits, for the reasons set forth in the motion for summary judgment on the policy claims, there is no triable constitutional issue here under the First Amendment law applicable to prison mail discussed below.

[9] Haque concedes that there is a grievance policy that informs of appeal rights but he claims that there is a factual dispute as to whether there are three administrative levels. (Resp. SMF ¶ 9.) He cross-references his Paragraph 2 of his Second Opposing Statement of Material Fact (Doc. No. 117) which, for this proposition, relies on

since December 1, 2009, is labeled Log No.10-MSP-20. (SAMF ¶ 3; Gorman Aff., ¶¶ 3-5 & attach.) This grievance concerned the denial to Haque of books he had subscribed to through a book club presumably in violation of the current mail policy's prohibition, found in Procedure A.22 governing book club subscriptions. (Id.; see Doc. No.96-1 at 7-8. Page ID Nos. 805-806.)

Haque adds that the threat of punishment for filing too many grievances makes the grievance process ineffective. (Resp. SMF ¶ 9; 2d Resp. SMF ¶ 2.) He cites to Procedure A.9 of the policy which includes a caution "that a client may have his/her use of the grievance process suspended or may be subjected to disciplinary action for abuse of the grievance process." (Grievance Policy Procedure A.9, Doc. No. 96-2 at 4, Page ID No. 827; Haque 1st Decl. ¶¶ 59, 60; see also Grievance Policy Procedure G, Doc. No. 96-2 at 9, Page ID No. 832.) He asserts: "On numerous occasions the plaintiff had to forgo filing a grievance because of the above said provisions … and fear of disciplinary/administrative action and punishment including but not limited to segregation in super max, out-of-state transfer, loss of paying job etc." (Haque 1st Decl. ¶ 61.) On the topic of grievances Haque highlights that the mail policy gives the right to corrections staff to immediately dispose of articles of mail and questions, if the addressee or sender does not know that the article of mail has been disposed of, how would the sender or addressee file a grievance? (2d Resp. SMF ¶ 2.) And he notes that the mail policy does not mention grievances. (Id.) He cites Paragraphs 167 and 168 of his verified complaint to prove that he did file grievances pertaining to some of the issues relevant to this lawsuit (2d Resp. SMF ¶ 3), although he fails to acknowledge that these paragraphs do no more than give the grievance

Paragraphs 10, 11, 12 of his Second Declaration (Doc. No. 118). This record citation does not create a dispute of fact. In fact, Exhibit 1 to the affidavit of Monica Gorman is evidence itself that there are three levels in the process and that Haque recently proceeded through them. (See Doc. No. 99-1.) Furthermore, this Court has a lengthy familiarity with the MDOC's three-step grievance process and has reviewed copies of grievances that were pursued through to the third level on countless occasions.

number and the page length.[10] He maintains that the Monica Gorman, secretary to the Commissioner of Corrections, affidavit statement that he did not exhaust his remedies is insufficient evidence that he did not. (Id.) While Haque maintains that Gorman failed to set out how records were searched (id.), the Gorman affidavit is not open to attack on that ground. He further reaches too far in suggesting that it is unclear whether or not his 2010 grievance was decided apropos the 2009 Mail Policy by stating that it was denied pursuant to the "current policy" rather than indentifying the policy by name and number. (2d Resp. SMF ¶ 4.)

According to the defendants, there could not have been exhaustion of these claims/ remedies with respect to the new limitations in the December 1, 2009, mail policy specific to internet, computer-generated, and photocopied materials prior to the filing of this suit on September 15, 2008. (SMF ¶ 10; Original Compl. & Ex. A.) Haque responds by citing his memorandum in opposition to the motion for summary judgment on the policy claims, in particular his argument that the matter is not moot because the prison can continue to change the policy in the future which may open the door for future rights violations. (Resp. SMF ¶ 10; Resp. Mot. Summ. J. Policy at 13-19.) I address this argument below. It does not create a tenable dispute of fact concerning the status of exhaustion of remedies apropos claims challenging this December 2009 Mail Policy procedure. Nor is this fact challenged by the suggestion that Haque did not file any grievances prior to filing this suit under the new policy because a fear of adverse action. (Resp. SMF ¶ 10.)

The reason for the mail policy's requirement that magazines, newspapers, or books be sent from publishers or commercial distributors is that in the past these items sent from others,

---

[10] Haque opines, "The question which the Court must answer in this case is this: if there are disputed issues of fact as to whether the plaintiff has exhausted his administrative remedies as required by … 42 U.S.C. § 1997e ..., and the plaintiff has requested a jury trial, must the disputed issue of fact be put to the jury for resolution?" (Id.)

including non-profit organizations, whose members and volunteers often are individuals with personal connections to prisoners, have frequently had drugs and other contraband hidden in them or have had their content altered. (SMF ¶ 11; Costigan Aff. ¶ 5.)[11] Defendant Costigan, the Prison Administrative Coordinator at the Maine State Prison, maintains that there are not the resources (staff, time, or money) available to adequately check all such publications for hidden contraband or altered content. (SMF ¶ 12; Costigan Aff. ¶ 5.) Costigan opines that there would not necessarily be tests readily available that would detect all drugs and hazardous substances. (SMF ¶ 13; Costigan Aff. ¶ 5.) Haque basically concurs vis-à-vis the test availability. (Resp. SMF ¶ 13.) With respect to the prison resource issue, Haque insists that there is a factual dispute about this assertion and he cites to a December 21, 2010, commentary by the Reverend Stan Moody, *Maine Dept. of Corrections: A 'black hole.'* (Doc. No. 121-26.) Moody, identified as a former chaplain at the Maine State Prison, takes former Department of Corrections Commissioner Martin Magnusson to task for "feathering" the Department's "job security nest" while leaving job creation "on the back burner." (Id.)

In comparison to non-profit organizations, Costigan relates, publishers and commercial distributors rarely have any personal connections to prisoners and, therefore, have no reason to try to hide contraband in or alter these publications. (SMF ¶ 14; Costigan Aff. ¶ 5.) Also, individuals and non-profit organizations wishing to get publications to prisoners need only arrange to have them sent from the publisher or a commercial distributor. (SMF ¶ 15; Costigan Aff. ¶ 5.)[12]

---

[11]    Haque attempts to challenge this statement by argument in his memorandum that it is not clear what the defendants mean by "non-profit organizations." (Resp. SMF ¶ 11; Resp. Mot. Summ. J. Policy at 28-29.) I discuss this and like vagueness challenges separately below.

[12]    Again Haque relies on an argument that there is a disputed fact about the meaning of terms used in the policy, this time highlighting "publishers and commercial distributors." (Resp. SMF ¶ 14.) He maintains that there is nothing wrong with having personal ties with publishers and distributors. (Id.) He further states that there is a

Pursuant to the mail policy, a publication not meeting the requirement that a magazine, newspaper, or book be sent from the publisher or a commercial distributor is to be returned to the sender, unless the return address cannot be determined from the mail itself, in which case it is to be disposed of.  Also, the prisoner is to be notified in writing of the publication's rejection. (SMF ¶¶ 16, 17; 2009 Mail Policy, Procedure E.1, Doc. No. 96-1 at 14 -15, Page ID Nos. 812-813.) The mail policy generally permits prisoners to be sent original, photocopied, and downloaded materials, except for email. (SMF ¶ 18; 2009 Mail Policy, Procedure A.17-20, Doc. No. 96-1 at 14 -15, Page ID No. 805.)[13]  By way of reference to paragraphs in his verified amended complaint, Haque insists that there is a genuine dispute of fact as to whether this policy is applied per its terms.  Most relevantly he cites the following paragraph:

> For example, Plaintiff Haque has had withheld and/or confiscated Islamic Calendars (on three or more occasions); catalogues on books of Islam (at least two times); photocopies of pages from a book on commentaries on the Holy Qur'an; newspaper clippings, articles from magazines and computer-generated printouts of newspaper and magazine articles of general interest; an issue of Prison Legal News, a monthly news magazine dealing with issues related to prisons and prisoners; newsletters from the Coalition for Prisoners' Rights, a nonprofit organization dedicated to prison law and prisoner issues; and newsletters and cards from Maine Books to Prisoners, a non-profit organization that distributes free books and newsletters to inmates in Maine. In each instance, Plaintiff Haque exhausted, unsuccessfully, his administrative remedies.

(Am. Compl. ¶ 112.)  He also relies on Paragraphs 167 and 168 of his amended complaint that refer to numerous grievances filed by MSP inmates "throughout the years" on issues related to this suit and lists -- without description but by log number and listing page numbers -- eighteen such grievances filed by Haque.

---

dispute of fact as to whether an individual running a non-profit organization or publishing or commercial distribution center can send publications to prisoners.  (Resp. SMF ¶ 15.)

[13]     Haque responds to all three of these paragraphs by also arguing that there is a procedural due process concern with the process (Resp. SMF ¶16) and a concern as to whether the policy is unconstitutional on its face or as applied (Id. ¶¶ 17, 18).

There is no dispute that, while at one time hardcover books were not allowed to be sent to prisoners, this is no longer the policy, custom, or practice. (SMF ¶ 19; Resp. SMF ¶ 19.) While at one time photocopied, computer-generated, and internet materials were not allowed to be sent to prisoners, that is no longer the policy, custom, or practice. (SMF ¶ 20; Costigan Aff. ¶ 7.)

What may be rejected for content because of the "media review" process is set out in detail in the mail policy. (SMF ¶ 30; 2009 Mail Policy, Procedure E.2- 3; Doc. No. 96-1 at 14-15, Page ID Nos. 812-13.)[14] The prisoner is to be notified in writing of any rejection through this process. Also, at least one copy of rejected material is to be retained long enough to enable a timely grievance to be filed and if one is filed it is to be retained until the completion of the grievance process. (SMF ¶¶ 31, 32; 2009 Mail Policy, Procedure E.4; Doc. No. 96-1 at 15, Page ID Nos. 813.)[15]

According to the defendants, the reason the mail policy does not require staff to send written notices to the senders or publishers of mail against which some action is taken under the mail policy is that there are not sufficient resources (staff, time, or money) to provide such notices. (SMF ¶ 33; Costigan Aff. ¶ 12.)[16] The defendants explain that instead of increasing demands on resources, the responsibility for providing any notification has been placed on the prisoners, who do have the time to provide such notice and, if need be, may provide it using the

---

[14]    (Resp. SAMF ¶ 30; Haque 1st Decl. 112 (quoted above).)

[15]    Once again Haque is relying on his memorandum arguments and not factual record materials to qualify these two paragraphs. (Resp. SMF ¶¶ 31, 32.)

[16]    In response Haque again cites to the commentary by the Reverend Stan Moody in which Moody chastises former Commissioner Magnusson for feathering the Department of Corrections' nest. (Resp. SMF ¶ 33; id. ¶ 12; Doc. No. 121-6.)

free writing materials and the two free weekly letters they are given pursuant to Procedure B.1 of the mail policy. (SMF ¶ 34; Costigan Aff. ¶ 12.)[17]

Inmates are informed of the immediate disposal of incoming mail whenever it is correspondence, a check or money order, or a newspaper, magazine, or book rejected because it was not sent from the publisher or a commercial distributor. (SMF ¶ 35; 2009 Mail Policy, Procedure A.13.b & 15, C.5 & E.1; Doc. No. 96-1 at 5-6, 11, 14, Page ID Nos. 803-04, 809, 812.)[18] Prisoners are not charged a processing fee in connection with mail. (SMF ¶ 36; Costigan Aff. ¶ 15.) [19]

According to the defendants, there is no monetary limit in the religious services policy with respect to religious journals or other publications. (SMF ¶ 37; Riley Aff. ¶¶ 7-8; Religious Service Policy, Doc. No. 96-4.) The only time any differentiation is made between religious mail and "secular" mail is in the context of commercial mail. In this context, while commercial mail is not generally allowed, it is allowed if it primarily discusses religious subject matter, with the benefit of the doubt being given to allowing the mail in. (SMF ¶ 38; Costigan Aff. ¶ 13; 2009 Mail Policy, Procedure A.21 & 22; Doc. No. 96-1 at 7-8, Page ID Nos. 805-806.) There is no requirement in the policy that prisoners order religious books, calendars, or other publications through the chaplain. The chaplain does maintain catalogs to facilitate the ordering of these publications, but prisoners are allowed to have their own religious catalogs and order publications from them directly. (SMF ¶ 39; Costigan Aff. ¶ 14; 2009 Mail Policy, Procedure

---

[17]     Haque states that there is a disputed factual issue as to whether this reasoning passes constitutional muster. (Resp. SMF ¶ 34.)

[18]     Haque cites the Maine Administrative Procedures Act asserting that this policy may not have been properly adopted per the rule-making procedures. (Resp. SMF ¶ 35.)

[19]     Haque responds by stating there is a disputed factual issue about this matter. (Resp. SMF ¶ 36.)

A.21, Doc. No. 96-1 at 7-8, Page ID Nos. 805-806; Religious Services Policy, Procedures D.1. and 2, Doc. No. 96-4 at 5,  Page ID No. 885.)[20]

### B.    Haque's First Statement of Additional Facts (Doc. No. 120)

It is Haque's opinion[21] that prison staff members do not identify themselves by name and rank on notification of non-delivery of mail or publication.  (SAMF ¶ 1; Haque 1st Decl. ¶¶ 4,5 & Attachs. A, E, F & G.)  As the defendants point out, Haque cannot make a general statement by relying only on four notices and they further observe that one of Haque's exhibits is proof that this information does appear on some notices.  (Resp. SAMF ¶ 1; Haque 1st Decl. Ex, B.)  According to Haque, any prison staff member may be a 'decision maker' concerning prisoner mail matters (SAMF ¶ 2; Haque 1st Decl. ¶ 6 & Exs. H,I,J,K,L), but the defendants respond that the evidence relied on only shows that over a six-year period, the names of four different staff members have appeared on the attachments (Resp. SAMF ¶ 2).  Haque believes that the defendants have created confusion by withholding the identity of the individuals who make the decision concerning mail matters in order to cause the prisoners to miss deadlines for filing grievances.  (SAMF ¶ 3; Haque 1st Decl.  ¶¶ 7,8 & Ex. H.)  However, there is no evidence that any prisoner, let alone Haque, has ever missed a deadline for filing a grievance about an action taken with respect to the mail.  (Resp. SAMF ¶ 3; Am. Compl. ¶ 168.)  Haque's Exhibit H is proof that the confusion over one category of mail involving Haque was quickly sorted out and he was directed to proceed with his grievances through Defendant Howlett.  (Resp. SAMF ¶ 3; Haque 1st Decl. Ex. H.)  There is no dispute that the staff used a variety of forms as notice to alert inmates to thrown-away mail.  (SAMF ¶ 4; Haque1st Decl.  ¶ 9; Resp. SAMF ¶ 4.)

---

[20]        Haque responds to all three of these assertions with a conclusory statement that there is a disputed factual issue concerning these matters, citing Paragraphs 10 through 21 of his First Declaration and Paragraphs 112 and 155 of his amended complaint.  (Resp. SMF ¶¶ 37-39.)

[21]        (See Resp. SAMF ¶¶ 1-3.)

### C. *Haque's Second Statement of Additional Facts (Doc. No. 117-1)*

In his second statement of additional fact Haque asserts as follows. The Maine Department of Correction employees providing notification of non-delivery of mail via mailroom in one case involving a different inmate did not provide their name and rank on the notification of non-delivery of mail. (2d SAMF ¶ 1; Reese Dec. ¶¶ 1-2 & Attach; Resp. 2d SAMF ¶¶ 1, 2, 3.) No mention of the name of the policy or the number of the policy and procedure applicable to the decision to return the mail to the sender is provided on the notice. (2d SAMF ¶ 2; Reese Decl. ¶ 3.) No mention of appeal rights and/or how the sender or the addressee may go about appealing the action/decision is provided. (2d SAMF ¶ 3; Reese Decl. ¶¶ 4-8.) Books at the MSP that arrive in the mail may be denied by any MDOC employee, including Deputy Warden Dardis, as illustrated by the decision on a third-party inmate's grievance. (2d SAMF ¶ 5; Gutfinski Decl. ¶¶ 1-3 & Exs. A & B; Resp. 2d SAMF ¶ 5.) [22] Haque believes that, rather than disposing of prisoner mail, the MDOC should return the mail or mark it "refused." (2d SAMF ¶ 7; Resp. 2d SAMF ¶ 7.)

### Discussion

### A. *Defendants' Request for Waiver*

In their reply to Haque's response to the summary judgment motion addressing policy claims the defendants argue that Haque has waived certain aspects of his challenges culled from his amended complaint by not defending them in his responsive memoranda. They say these claims include: Haque's claims about there being "no written guidelines in the mail policy informing prisoners how to send out mail weighing more than an ounce, mail to foreign

---

[22] Understandably the defendants have responded to this sequence of additional facts by pointing out that the record support relied on – the declaration of a third party inmate – is not sufficient to support the broad characterization that Haque attempts to put forth. (Resp. SAMF ¶¶ 1, 2, 3, 5.)

countries, certified mail, and mail sent through 'property'[23] and his claim that prisoners at 'property' handling mail leads to an identity theft and fraud vulnerability.'[24] (Reply Mem. Policy Claims at 8.) See Grenier v. Cynamid Plastics, 70 F.3d 667, 678 (1st Cir. 1995). The defendants also argue that Haque has expressly abandoned his claims about a ban on greeting cards with recorded messages and the retention of materials rejected through the media review process until there is a full administrative review. (Reply Mem. Policy at 8.)[25]

In responding to the defendants' argument that some of his claims are moot given the 2009 revisions to the Mail Policy, Haque complains that the MDOC polices are a moving target because they are always open to revision going forward. (See Resp. Summ. J. Policy at 15.) It is far more apt to say that Haque's claims are a moving target that has put a substantial burden on the defendants and this Court. Given the history of this case, the opportunity given Haque to file his amended complaint towards finalizing his claims, and his demonstrated competence in responding to the motion for summary judgment, it is only fair to the defendants and a sound use of this court's discretion to limit Haque to his articulation of claims in his two memoranda responding to the motions for summary judgment that were also adequately pled in his amended complaint. I have therefore determined that the specific claims set forth above have been waived and I do see no reason why this court's analysis need include these particular claims.

**B.** *The Claims as they stand at Summary Judgment*

*1. Haque's First Amendment claims and the Turner v. Safley standard*

---

[23]    The defendants have set forth multiple statements of fact relating to these claims. (See SMF ¶¶ 21-29.) For his part Haque responds to all these paragraphs by relying on Paragraphs 22 through 58 of his First Declaration (Doc. No. 121). (Resp. SMF ¶¶ 21-29.)

[24]    With regards to this claim Haque only remarks in his responsive memorandum that because the defendants admit that inmates work with incoming and outgoing mail then that solves the staff problem identified by the defendants as a reason for some of the challenged limitations. (Resp. Summ. J. Policy at 29.)

[25]    The defendants point out that Haque has tried to now frame this claim as retention until judicial review rather than administrative review but this was not an aspect of his amended complaint, nor does Haque adequately support it in his memorandum. (Id. at 8 n.12.)

Haque may proceed with this 42 U.S.C. § 1983 mail-related First Amendment claim if he can demonstrate that the complained-of policies are not "reasonably related to legitimate penological interests." Turner v. Safely, 482 U.S. 78, 89 (1987). This court must determine:

> (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) whether "there are alternative means of exercising the right that remains open to prison inmates"; (3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates"; and (4) whether there is an "absence of ready alternatives."

Id. at 89-90 (citations and internal quotation marks omitted). See also Beard v. Banks, 548 U.S. 521 (2006); Andrews v. Comm'r, Me. Dept. of Corr., 1:10-cv-00134-DBH, 2010 WL 2244086, 3 -4 (D. Me. May 28, 2010); Cole v. Me. Dept. of Corr., 1:07-cv-082-DBH, 2009 WL 585796 (D. Me. 2009) (recommended decision).[26] "The burden, moreover, is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." Overton v. Bazzetta, 539 U.S. 126, 132 (2003).

a. *First Amendment speech*

My first step through this thicket is to address whether there are any jury trial-worthy factual issues pertaining to Haque's amended complaint/summary judgment core complaints concerning the free speech related mail restrictions at the Maine State Prison.

i. **The internet, computer-generated, and photocopied material claim-Procedures A.17-A.20, E.2[27]**

The current mail policy specific to internet, computer-generated, and photocopied materials is, on its face, not subject-matter based. Furthermore, Haque did not include his challenge to the most recent policy in his amended complaint. While at one time photocopied,

---

[26] Shortly after my recommendation in Cole the parties settled so the recommended disposition was never addressed by the assigned District Judge.

[27] (Resp. Summ. J. Policy at 25-28.)

computer-generated, and internet materials were not allowed to be sent to prisoners, that is no longer the policy, custom, or practice. Haque insists that the "restrictions concerning internet, computer generated or photocopied materials ranges from the bizarre to insane." But his citations to exhibits that he has but he 'thinks' are going to be disposed of under the policy are purely speculative. And it is clearly the case that Haque has not exhausted his administrative remedies with respect to challenging this new policy. See 42 U.S.C. § 1997(e)(a). I address the merits of Haque's claim under the previous policy/ies below.

## ii. **Misrepresentation of the term "non-profit organizations"[28]**

The defendants have articulated that the reason for the mail policy's requirement that magazines, newspapers, or books be sent from publishers or commercial distributors is that in the past these items sent from others, <u>including non-profit organizations, whose members and volunteers often are individuals with personal connections to prisoners</u>, have frequently had drugs and other contraband hidden in them or have had their content altered. Compared to non-profit organizations, publishers and commercial distributors rarely have any personal connections to prisoners and, therefore, have no reason to try to hide contraband in or alter these publications. The defendants assert that there are insufficient resources -- staff, time, or money -- available to adequately check all such publications for hidden contraband or altered content. Haque's reliance on the commentary that former Department of Corrections Commissioner Martin Magnusson is "feathering" the Department's "job security nest" while leaving job creation "on the back burner" does not take him through the summary judgment pass; the piece is inadmissible as opinion and the opinion itself is not material to staffing levels at the prison. There is no genuine dispute that there is not a known mechanized test readily available that

---

[28] (Resp. Summ. J. Policy at 28-29.)

would detect all drugs and hazardous substances.  Also, individuals and non-profit organizations wishing to get publications to prisoners need only arrange to have them sent from the publisher or a commercial distributor; this may not be an ideal solution but it is a <u>Turner</u> alternative that Haque has not attempted to debunk.

I conclude that, viewed through the <u>Turner</u> four-point compass, the defendants are entitled to summary judgment on this aspect of Haque's amended complaint.  Haque's assertion that there is some sort of misrepresentation of "non-profit organizations" is simply unsupported by any record evidence that the defendants are playing fast and loose with this policy limitation. Per <u>Turner</u>, the defendants have advanced a valid, rational connection between the policy and the institutional concerns, there is record evidence in Costigan's affidavit[29] that to allow mail from non-profit organizations would stress the resources of the prison, the defendants have pointed out that there are alternative means for the inmates to obtain the materials, and Haque has not articulated an alternative means to achieve the goal of the policy (indeed he concedes that there are no available testing systems of which he is aware that could alleviate the burden on prison staff).

       b.     ***Freedom of Religion Claim under the First Amendment***

As set forth above, the heart of Haque's religion-based restrictions – in terms of the evidence bestowed on this court by both sides – is the years-ago denial of Muslim calendars

---

[29]      <u>Wardell v. Duncan</u> addressed a very similar evidentiary question:

We owe deference to the professional judgment reflected in this affidavit. <u>Beard</u>, [548 U.S. at 529-30] (following <u>Overton v. Bazzetta</u>, 539 U.S. 126, 132 (2003)). To defeat summary judgment, it is not enough for plaintiff to disagree with the views expressed in the affidavit; he must point to evidence creating genuine factual disputes that undermine those views. <u>Id.</u> (same). Absent such evidence, defendants' affidavit is sufficient to establish, on summary judgment, "that the regulations do, in fact, serve the function[s] identified" by the prison defendants. <u>Id.</u> at 2579; <u>see</u>, <u>e.g.</u>, <u>Wirsching [v. Colorado]</u>, 360 F.3d [1191,] 1199-1201 [(10th Cir. 2004)] (upholding prison policy based on official's affidavit satisfying several <u>Turner</u> factors, including the first).

470 F.3d 954, 960 (10th Cir. 2006).

(denials apparently premised on a version of the pertinent policies that were not explicitly based on the religious content of the particular calendar in question). He further complains that there is a monetary limit in the religious services policy with respect to religious journals and other publications. (Resp. Summ. J. Policy at 33; Haque 1st Decl. ¶¶ 15-21.)

Haque maintains that on more than one occasion he had religious materials withheld or disposed of because they did not come through the chaplain. Referring to an incident where he has not exhausted his administrative grievances for purpose of this action, he states that on September 19, 2010, he sent out a book order to Halalco Book which primarily sells books on Islam. (Haque 1st Decl. ¶ 11 & Ex. N.) While the order was approved by the correctional staff, Haque received a letter in September 2010 that all religious/spiritual catalog orders by inmates needed to go through the chaplain's office before being sent out. (Haque 1st Decl. ¶¶ 11, 12 & Ex. O.) As a consequence his order was not processed until October 6, 2010. (Haque 1st Decl. ¶ 14 & Ex. P.) In replying to Haque's response, the defendants submit the following affidavit statements of the non-defendant Chaplain Foster:

> 1. I am the Chaplain at the Maine State Prison and have been since 2006.
> 2. I understand that prisoners are allowed, per DOC policy, to order religious books, calendars, or other publications through the mail without going through me.
> 3. At the time I wrote the September 10, 2010, memo to Nadim Haque about the need for religious catalog orders to go through me, I understood this.
> 4. However, I did not realize the order in question was for books, as many items, such as kufis and prayer rugs, are ordered through the Halalco Books catalog.
> 5. My main concern was to do Mr. Haque a favor by expediting the order, and I just did not notice that it was for books.
> 6. I wrote the memo with the idea that the order was not for publications.

(Foster Aff. ¶¶ 1-6, Doc. No. 132.) The most that can be said about this factual scenario is that the non-defendant chaplain was negligent in not following prison policy. See cf. Daniels v. Williams, 474 U.S. 327, 328 (1986) ("[T]he Due Process Clause [of the Fourteenth Amendment]

is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property.").[30] And it must be noted that a seven-day delay in processing Haque's mail-related request would not be a cognizable constitutional claim even outside the prison setting.

Paragraph 112 of Haque's amended complaint avers that Haque has had withheld and/or had confiscated Islamic calendars (on three or more occasions), catalogues on books of Islam (at least two times), and photocopies of pages from a book on commentaries on the Holy Qur'an. Beyond this paragraph in his amended complaint, Haque has not provided the court with any substantiation of these superficial factual averments.  He is relying instead on a rather generalized description of his experience with his mail which <u>may</u> be specific enough to plead a cause of action but which should be supported at this stage of the litigation with record evidence beyond a paragraph in a verified complaint.

The defendants insist that there is no monetary limit in the religious services policy with respect to religious journals or other publications and that the only time any differentiation is made between religious mail and "secular" mail is in the context of commercial mail.  In this context, while commercial mail is not generally allowed, it is allowed if it primarily discusses religious subject matter, with the benefit of the doubt being given to allowing the mail in.  There is no requirement that prisoners order religious books, calendars, or other publications through the chaplain but the chaplain does maintain catalogs to facilitate the ordering of these

---

[30]     In relation to this claim, Haque has referenced three exhibits that are pretty nebulous but are meant to demonstrate that his religious items have been withheld awaiting approval of the chaplain.  This seems to be a different question than whether or not he has to order <u>through</u> the chaplain – indeed the withholding of incoming materials suggests that this is not the case.   He also maintains that this is evidence of destruction but the three exhibits do not support such an inference sufficiently to create a jury-worthy issue because it is so unclear – giving Haque all the benefit of inferences on the record before me – what he argues actually happened.

publications. Prisoners are allowed to have their own religious catalogs and order publications from them directly.

Although he did not mind his Ps and Qs -- by the local rules -- towards establishing the point in the summary judgment record, Haque draws the court's attention to attachments to the policy procedures that limit inmates to a maximum value of $50 for any religious item including journals and publications. His evidence -- as cited above by page identification number -- is a copy of the Religious Services Policy provided to the court by the defendants. In the reply memorandum concerning policy claims, the defendants attempt to explain this perplexity as follows:

> Haque's denial of statement 37 is the only one that is on point and well-grounded (though that does not necessarily mean that his rights were being violated). This particular statement was meant to address the claim made in the amended complaint (¶ 153) that while the mail policy sets no monetary limit with respect to religious publications, the religious services policy does. In fact, while there is nothing like that in the policy document itself, as pointed out by the plaintiff, there was recently added to an attachment to the policy wording about a monetary limit. However, this wording was not meant to cover religious publications and there is no evidence it was ever actually implemented in that way. Perhaps more important, that error has now been corrected. See the Second Affidavit of Esther Riley and the attachment thereto.

(Reply Summ. J. Policy Issues at 7-8.) Riley's second affidavit explains that there was human error involved in drafting the original attachments and that the attachments to the policy have now been corrected to reflect that the $50 limitation does not cover religious journals, religious publications, including religious calendars and religious CDs. (Doc. No. 131-1, Page ID No. 1183.) This type of mea culpa on the defendants' part is not a common twist in prisoner-related litigation. However, there is no factual support for a case by Haque that he was hindered by this attachment confusion in getting his religious journals, religious publications, religions calendars, or religious CDs <u>because of</u> the erroneously noted dollar limitation on the attachment. Haque

does have allegations about long-ago rejected calendars but there is no indication that any of his complaints about access to religious materials had anything to do with the mistaken dollar-value limitation on the attachment.

    *c.*  ***First Amendment Specific Mail Claims***

  With respect to the defendants' assertion that the only paragraph from the original complaint concerning specific mail is now numbered Paragraph 112 in his amended complaint, Haque attempts to cite all the non-descriptive grievances summaries in Paragraphs 167 and 168 as somehow proving that there were other grievances relating to specific mail. (Resp. Mot. Summ. J. Specific Mail Claims at 6.) He also relies on Paragraph 112 of his verified amended complaint and the use, therein, of the term "for example" to suggest that this was not meant to be a complete list and asserts that the onus was on the defendants to go through the listed grievances to find other examples. (<u>Id.</u> at 6-7.) Haque fails to recognize that the Court must have this information before it by this stage of the litigation and if there is record evidence key to his summary judgment showing it is <u>Haque's</u> burden to submit the documents and integrate them into his factual statements. I reiterate, Haque "cannot rely on an absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute." <u>McCarthy</u>, 56 F.3d at 315.

  It is difficult to attempt a <u>Turner</u> analysis as a consequence of the feeble showing Haque has made to preserve his claim for injury relating to these vague allegations of specific mail denied because of religious or speech content. To make a factual dispute "genuine", "the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party." <u>One Parcel</u>, 960 F2d at 204. A jury presented with the contents of Paragraph

112 and the nonspecific summary of grievances in Haque's complaint could not, without more, arrive at a conclusion that Haque's constitutional rights were violated.

### 2. Fourteenth Amendment Procedural Due Process Claim Relating to Mail Disposal, Designee, and Reviewer Discretion[31]

"[T]he decision to censor or withhold delivery of a particular letter must be accompanied by minimum procedural safeguards." Procunier v. Martinez, 416 U.S. 396, 417 (1974). Martinez concluded that there was no due process violation if the inmate was "notified of the rejection of a letter written by or addressed to him, that the author of that letter be given a reasonable opportunity to protest that decision, and that complaints be referred to a prison official other than the person who originally disapproved the correspondence." Id. at 418-19. See also Thornburgh v. Abbott, 490 U.S. 401, 413 (1989). ("[W]e now hold that regulations affecting the sending of a "publication" … to a prisoner must be analyzed under the Turner reasonableness standard. Such regulations are "valid if [they are] reasonably related to legitimate penological interests." Turner, 482 U.S., at 89).[32]

Haque's claim is summarized as follows: "The sole discretion given to the MDOC officials to arbitrarily 'immediately dispose of' articles of mail violates, among other things, sender's and addressee's procedural due process rights and denies any kind of meaningful administrative or judicial review." (Resp. Mot. Summ. J. Specific Mail Claims at 20.)[33]

In responding to the defendants' dispositive motions Haque speculates that there is mail disposed of immediately, the inmate cannot produce a copy to challenge the disposal, and, then,

---

[31]     (Resp. Summ. J. Policy at 29-32.)

[32]     Haque makes much of the Thornburg distinction between incoming and outgoing mail but he does not develop his case based on outgoing mail; he is fixated on incoming mail which clearly falls under the Turner paradigm of reasonableness rather than strict scrutiny.

[33]     As mentioned in my discussion of waiver, it is the defendants' contention that the judicial review aspect of this claim was not contained in the amended complaint and therefore is in essence an impermissible attempt to yet again amend.

there is no chance of meaningful third-party review by the administration or the courts.  (See, e.g., Resp. Mot. Summ. J. Specific Mail Claims at 18-19) (quoting extensively from George v. Smith, 467 F. Supp. 2d 906, 919-22 (W. D. Wis. 2006)).  He opines:  "There is no way of possibly telling for sure as to how many articles of mail the Defendants have destroyed."  (Id. at 20.)

Haque has presented evidence that prison staff members do not always identify themselves by name and rank on notification of non-delivery of mail or publication but he presents only four notices on non-identification and this information does appear on some other notices Haque has submitted.  Over a six-year period the names of four different staff members have appeared on the notices, a variation that seems entirely understandable given staffing rotations and staff turnover.  Haque believes that the defendants have created confusion by withholding the identity of the individuals who make the decision concerning mail matters in order to cause the prisoners to miss deadlines for filing grievances but there is no evidence that any prisoner, let alone Haque, has ever missed a deadline for filing a grievance about an action taken with respect to the mail and there is evidence that staff have notified Haque of the proper avenues for exhausting mail-related grievances.  Thus, Haque has submitted evidence that he is aware of his 'appeal rights.'  The fact that there are a variety of forms used to notify inmates of problematic mail and that there is more than one 'decision maker' does not create an inference that due process rights are being infringed.  It is also of little moment that not every notice cites to a policy number in addition to giving the inmate an explanation for the treatment of the mail. While Haque believes that, rather than disposing of prisoner mail, the MDOC should return the mail or mark it "refused" – I suppose an attempt to address the 'alternative means' Turner prong in the context of a due process claim – this is an inadequate response to the case the defendants

have established for the institutional need to have this policy in place. Furthermore, because the inmate receives notification of the refusal it is in her or his power to notify the sender of the disposal.

Lena v. DuBois, an unpublished First Circuit opinion explained:

> With respect to plaintiff's due process claim, we need not decide whether the pertinent state regulations suffice to establish a property or liberty interest. It is in any event clear that plaintiff received all the process that was due. The fact that he was not provided with prompt, written notice of the book's return, as required by the regulations, is without consequence. Plaintiff was eventually so notified and was able to pursue an appropriate appeal to the superintendent. In Procunier v. Martinez, 416 U.S. 396 (1974), the Court upheld restrictions on incoming mail that required "that an inmate be notified of the rejection ..., that [he] ... be given a reasonable opportunity to protest that decision, and that complaints be referred to a prison official other than the person who originally disapproved the correspondence." Id. at 418-19. Each of these safeguards was observed here. Contrary to plaintiff's contention, the prison regulations did not require a hearing prior to the book's return.

No. 93-1924, 1994 WL 99940, 1 (1st Cir. Mar. 23 1994) (unpublished).

**3. Vagueness challenges to "verifiable" name and address, "reasonable suspicion," "designee" "contraband," and "substantial monetary value."[34]**

"A law or regulation can be deemed unconstitutionally vague if 'men of common intelligence must necessarily guess at its meaning and differ as to its application....'" Jones v. Caruso, 569 F.3d 258, 276 (6th Cir. 2009) (quoting Connally v. Gen. Constr. Co., 269 U.S. 385, 391 (1926)). The vagueness doctrine applies in the context of prison mail policies when the challenge is brought on an as-applied basis. Id. See also Jones v. Salt Lake County, 503 F.3d 1147, 1155 - 56 (10th Cir. 2007).

Procedure A.7 of the mail policy provides that "a prisoner may be prohibited from sending general mail to or receiving general mail from any other person by the Chief Administrative Officer, or designee, when there is reasonable suspicion that mail between them

---

[34] (Resp. Summ. J. Policy at 23-25.)

would contain <u>contraband</u>."  I agree with the defendants that "designee" and "verifiable" are common, normal English words that are easily looked up in a standard dictionary.  As for contraband, the Mail Policy's Procedure E sets forth what falls within those parameters apropos mail and the Property Policy gives a very thorough listing of what is and is not allowed at the prison.  (<u>See</u> Property Policy, Doc. No. 96-3.)  Procedure A.12.a of the Mail Policy explains by examples what are items with "<u>no substantial monetary value</u>" and gives some concrete examples that are clearly not meant to exclude other similar items.  I conclude that Haque vagueness challenges are entirely meritless.

### 4.    *Regarding the 2010 Grievance*

As indicated above, the defendants assert that the mail-policy claim is the only fully exhausted grievance filed by Haque in the wake of the new policy and it should not be considered in the lawsuit because it was filed after the 2008 commencement of this suit.  This is true enough.  However, it is not such a slam-dunk as it appears.  The third-level determination on this grievance was signed on March 11, 2010.  Haque's amended complaint was entered on the docket as the operative complaint on May 3, 2010, (although he actually executed his verification in February 2010, a step taken before the February 16, 2010, motion to amend was entered.  (Doc. No. 59.)  This grievance is mentioned in the amended complaint as follows: "Log No. 2010-msp-20; pending response from the Warden."  (Am. Compl. ¶ 168, Doc. No. 83 at 19, Page ID No. 737.)

The grievance concerned two books sent to Haque by Time Life Books.  Haque indicates that he was notified of the withholding of the books but was briefly allowed to see the packages.  He states that one was apparently <u>Time Almanac 2010</u> and the other was <u>Time Abraham Lincoln</u>.  (2010 Grievance, Doc. 99-1 at 5, Page ID No. 909.)

The grievance documentation indicates that the books were withheld because they were from a book club. Warden Barnhart relayed in her second-level appeal denial that inmates were not allowed to participate in music and book clubs because the prison did not have the staff to return books that the inmate did not want. (Id. at 39, Doc. ID No. 941.) She also stated that volume of commercial mail associated with such memberships increases the burden on the mail room staff. (Id.) The final review by then Commissioner Magnusson indicates that he was denying the appeal for the reasons already articulated and noted that Haque's appeals were not timely. (Id. at 40, Doc. ID No. 944.) The Commissioner's notice of denial included a reflection that the policy not to allow books from book clubs was premised in part on a concern that inmates would participate in these clubs without having the means to pay for the books in question, describing this type of acquisition as "criminal behavior." (Id.)

Even if I were to include this grieved complaint about the mail policy as one that was exhausted due to the unusual circumstances of this litigation and the post-third-level-appeal docketing of Haque's amended complaint, a potential claim about this policy as specifically applied to Haque is meritless on the record before me. As the First Circuit has noted addressing a similar challenge:

> With respect to plaintiff's First Amendment claim, it is clear that the restriction on "bill later" materials is "reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89 (1987); see Thornburgh v. Abbott, 490 U.S. 401, 413 (1989) (prison restrictions on incoming correspondence are to be assessed under Turner test). The superintendent here explained that the pre-payment requirement was implemented in order to prevent inmates from committing fraud on businesses and obligating funds beyond their means. Contrary to plaintiff's contention, the legitimacy of these justifications "cannot seriously be questioned." Rodriguez v. James, 823 F.2d 8, 12 (2d Cir. 1987). Applying the four criteria enumerated in Turner, see 482 U.S. at 89-91, other courts have uniformly upheld restrictions similar to that involved here on First Amendment grounds. See, e.g., Rodriguez, supra (rule requiring that all outgoing mail addressed to commercial entities be submitted in unsealed form for

inspection, to ensure that all items ordered have been prepaid); <u>Theriault v. Magnusson</u>, 698 F. Supp. 369, 371-72 (D. Me. 1988) (rule requiring that all outgoing correspondence be placed in envelopes embossed with prison legend to deter fraud on businesses); <u>Gardner v. Dalimonte</u>, 1991 WL 71034 (Magis. W.D. Mich. 1991) (ban on book-club memberships); <u>see</u> <u>also</u> <u>Eckford-El v. Toombs</u>, 760 F. Supp. 1267, 1271 (W.D. Mich. 1991) ("Prison officials are justified in forbidding inmates from entering into certain kinds of credit arrangements.") (dicta).

<u>Lena</u>, 1994 WL 99940 at 1.

### *5. Religious Land Use and Institutionalized Persons Act*

The First Circuit summarizes the applicability of the Religious Land Use and

Institutionalized Persons Act (RLUIPA) as follows:

RLUIPA was enacted in 2000 as a response to the Supreme Court's decision in <u>City of Boerne v. Flores</u>, which partially struck down the previously enacted Religious Freedom Restoration Act on the grounds that it exceeded Congress' power to regulate the states under the Fourteenth Amendment. 521 U.S. 507, 529-36 (1997) (holding that RFRA may not be applied to purely state, as opposed to federal, action). Whereas RFRA had applied to all action by "Government," RLUIPA is substantially narrower in scope, and the portion of that statute at issue in this case applies only to "a program or activity [in an institution] that receives Federal financial assistance." 42 U.S.C. § 2000cc-1(b)(1). Substantively, RLUIPA provides that

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in [42 U.S.C. § 1997], even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person-

(1) is in furtherance of a compelling governmental interest; and
(2) is the least restrictive means of furthering that compelling governmental interest.

<u>Id.</u> § 2000cc-1(a). Thus, a claim under RLUIPA includes four elements. On the first two elements, (1) that an institutionalized person's religious exercise has been burdened and (2) that the burden is substantial, the plaintiff bears the burden of proof. <u>Id.</u> § 2000cc-2(b). Once a plaintiff has established that his religious exercise has been substantially burdened, the onus shifts to the government to

show (3) that the burden furthers a compelling governmental interest and (4) that the burden is the least restrictive means of achieving that compelling interest. Id.

Spratt v. Rhode Island Dept. Of Corr., 482 F.3d 33, 37 -38 (1st Cir.2001).

In his only real articulation of his RLUIPA claim, Haque argues that the ability of jail staff to immediately dispose of articles of mail violates his rights under this statute.  (Resp. Mot. Summ. J. Specific Mail Claims at 29.)  Haque relays that he is a Muslim and sincerely practices the teachings of Islam.  (Id.)  Without supporting record citation, he asserts that the defendants did not set forth in their grievance responses a compelling governmental interest to justify discarding the articles of mail at issue, nor did they represent to Haque that this was the least restrictive means to achieve that interest.  (Id.)  He maintains that on more than one occasion his photocopies of religious text and materials were immediately disposed of and these were documents that were sacred items.  (Id.; Haque 2d Decl. ¶ 17.)  As relevant in this very non-specific paragraph of his Second Declaration Haque states, "On more than one occasion photocopies of religious text were removed from articles of mail and disposed with."  (Haque 2d Decl. ¶ 17.)  Not only did Haque not include operative facts in his responsive or additional fact statements by citing this declaration, this declaration is so threadbare of detail corroborating 'the what and when' that, in my view, it is insufficient to justify sending this count to trial.  To be admissible the declaration or similar testimony must be grounded in personal knowledge. Accordingly, Haque should be able to be very much more specific about the occasions of removal and disposal and how he came to know about them.  But if this kind of generalized testimonial assertion is all he is able to provide a jury in terms of satisfying his key showing of a "substantial burden" then there is no reason to send the claim to the jury.

"Under RLUIPA," the Fifth Circuit recently observed,

the plaintiff bears the initial burden of proving that "the challenged government
action 'substantially burdens' the plaintiff's religious exercise.'" Mayfield v. Tex.
Dept. of Criminal Justice, 529 F.3d 599, 613 (5th Cir.2008). A government action
imposes a substantial burden on religious exercise if it "truly pressures the
adherent to significantly modify his religious behavior and significantly violate
his religious beliefs." Adkins v. Kaspar, 393 F.3d 559, 570 (5th Cir.2004).

DeMoss v. Crain, __ F.3d __, __, 2011 WL 893733, 2 (5th Cir. Mar. 2, 2011). "Mere

'inconvenience'-such as isolated or sporadic incidents burdening religious exercise-does not

suffice as a 'substantial burden.'" Ajaj v. Federal Bureau of Prisons, Civil Action No. 08-cv-

02006-MSK-MJW, 2011 WL 902440, 3 (D. Colo. Mar. 10, 2011) (quoting Strope v. Cummings,

381 Fed.Appx. 878, 881 (10th Cir.2010), in turn citing Abdulhaseeb v. Calbone, 600 F.3d 1301,

1212-15 (10th Cir.2010)).

### 6.    Maine Administrative Procedure Act

To the extent that Haque even states a claim under the the Maine Administrative

Procedures Act (and I am dubious of that) I recommend that the court decline to exercise

supplemental jurisdiction.  See 28 U.S.C. 1367(c); Rodriguez v. Doral Mortg. Corp., 57 F.3d

1168, 1177 (1st Cir.1995) ("As a general principle, the unfavorable disposition of a plaintiff's

federal claims at the early stages of a suit ... will trigger the dismissal without prejudice of any

supplemental state-law claims."); accord Gonzalez-De-Blasini v. Family Dept., 377 F.3d 81, 89

(1st Cir.2004).

### C.    Haque's Theory of the Case not related to the Key Legal Merits of his Claims

Given my recommendation that judgment be entered in the defendants' favor without a

trial, I must point out that Haque has been a rigorous, articulate, and persistent litigant in this

proceeding.  I have tried to address his claims straightforward on the merits rather than chasing

tangents that might or might not determine the outcome of the case.  One twilight-zone area

concerns the possible mootness of Haque's claims given the December 2009 revisions to the prison's mail policy.[35]  This interlinks with the question of potential (or lack thereof) remedies available to Haque given the limitations of recovery for non-physical injury in 42 U.S.C. § 1997e(e) and the limitations on relief in 18 U.S.C. 3626, as well as implicating certain exhaustion questions under 42 U.S.C. § 1997e(a).  Haque also <u>repeatedly</u> insists that the 2009 Mail Policy 21.2 is not the only document that governs the treatment of mail.  (<u>See</u>, <u>e.g.</u> Resp. Summ. J. Specific Mail Claims at 5.)  He has not, however, at this very late stage of the litigation, provided the court with record evidence of the other written or un-written policies or customs -- in addition to the four policies attached by the defendants -- that are measurably and meaningfully at play other than his rank speculation and assertions about the unbridled power of prison staff when it comes to mail policy implementation.  What is more, the Tenth Circuit reflected in <u>Jones v. Salt Lake County</u> that there is nothing inherently unconstitutional about having prison regulations that do not fall within the four corners of a published policy:

> We have found no cases, and Jones points to none, requiring prison regulations to be written and publicized in order to meet constitutional requirements. Rather, the constitutionality of a prison regulation, whether written, unwritten, publicized or unpublicized, is governed by <u>Turner</u>. Indeed, we and other circuits have applied <u>Turner</u> to unwritten prison policies and other prison actions. See <u>Frazier v. Dubois</u>, 922 F.2d 560, 562 (10th Cir.1990) ("Although <u>Turner</u> addresses prison rules and regulations, we see no reason why the <u>Turner</u> principle should not apply to other prison actions, such as the transfer here."); <u>see also</u> <u>Victoria W. v. Larpenter</u>, 369 F.3d 475, 479, 483-86 (5th Cir.2004) (applying <u>Turner</u> to unwritten prison policy requiring inmates who wish to obtain an elective medical procedure to obtain a court order); <u>Shimer v. Washington</u>, 100 F.3d 506, 508-10 (7th Cir.1996) (applying <u>Turner</u> to unwritten policy prohibiting prison employees from writing Prison Review Board directly); <u>Cornwell v. Dahlberg</u>, 963 F.2d 912, 917 (6th Cir.1992) (noting <u>Turner</u> "has been applied to unwritten prison policies

---

[35]    I agree with Haque that if he could survive summary judgment on his claim of earlier harm to him then his claims for damages would not become "moot." (Resp. Summ. J. Specific Mail Claim at 16-17.)  I reject his argument that the doctrine of "continuing wrong somehow connects his 2002 claim to his 2010 claim (that was not exhausted prior to filing this action).

as well as prison regulations"); c.f. Faustin v. City & County of Denver, Colo., 423 F.3d 1192, 1196 n. 1 (10th Cir.2005) ("Our precedent allows [First Amendment] facial challenges to unwritten policies.").

503 F.3d at 1159 n. 13. [36]

I have been attentive to Haque's exhibits accompanying his declarations and proposed amended complaint. What I am quite confident in is that Haque, although given a very generous opportunity to plead and defend his case in the context of this lengthy litigation, has failed to demonstrate that there is a trial-worthy factual dispute on his federal claims.

## Conclusion

For the reasons set forth above, I recommend that the Court grant both motions for summary judgment as they relate to Haque's federal claims against all defendants. I further recommend that the Court decline exercising supplemental jurisdiction over the state law Maine Administrative Procedures Act claim. If the Court accepts this recommendation, the pending motion to dismiss by a subset of these defendants would be moot, as would the pending motion to amend the answer to the amended complaint.

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

---

[36] It is also unnecessary to address the dispute concerning Haque's failure to remove the plural from the plaintiffs' claim in the original complaint. (See Summ. J. Specific Policy Claim at 1 &n.1; Resp. Summ. J. Specific Mail Claims at 5- 7.) I have addressed the question of whether the new paragraphs are too conclusory above.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

April 8, 2011